IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 CR 156 |
| vs. | ) | |
| | ) | Hon. Ruben Castillo |
| BENJAMIN CANTIN, | ) | |
| Defendant. | ) | |

## NOTICE OF FILING

TO:   Renai Rodney                    Rebecca Fowlie
      Assistant United States Attorney      United States Probation Office
      219 S. Dearborn Street, 5th Floor      55 E. Monroe Street, 15th Floor
      Chicago, IL 60604                Chicago, IL 60603

Please take notice that on this 16th day of July, 2008, the undersigned filed the following document(s) in the above-captioned cause, a copy of which is attached hereto.

–     SENTENCING MEMORANDUM

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By:   s/Mary H. Judge_____
      Mary H. Judge

MARY H. JUDGE
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL  60603
(312) 621-8336

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 156-1 |
| | ) | Hon.  Ruben Castillo |
| BENJAMIN CANTIN | ) | |

## SENTENCING MEMORANDUM

Defendant BENJAMIN CANTIN, by the FEDERAL DEFENDER

PROGRAM and its attorney MARY H. JUDGE, respectfully requests, pursuant to

18 U.S.C. § 3553(a), *Gall v. United States*, 128 S.Ct. 586 (2007), *Rita v. United*

*States*, 127 S.Ct. 2456 (2007), and *United States v. Booker*, 543 U.S. 220 (2005), that

this Honorable Court impose a sentence without application of the career

offender guideline enhancement and in consideration of Mr. Cantin's significant

mental health and substance abuse treatment needs, because such a sentence is

sufficient, but not greater than necessary, to comply with the purposes of

sentencing enumerated in 18 U.S.C. § 3553(a).  Mr. Cantin states as follows:

I.    **Factual Background**

Benjamin Cantin is 31 years old and has an extensive history of mental

illness and alcohol dependence.  Mr. Cantin endured severe physical and

emotional abuse as a child at the hands of his step-father, and his mother kicked

him out of his home at age fifteen.  Mr. Cantin suffers from numerous mental

illnesses, including Bipolar Disorder, Major Depressive Episodes, Panic Disorder, and Generalized Anxiety Disorder, and has a history of self-medicating with alcohol that led to a dependency that lies at the heart of this case.  After failed attempts to obtain treatment, homeless, and in a desperate, intoxicated state, Mr. Cantin committed the bank robbery for which he is being sentenced.  Although the seriousness of the offense and Mr. Cantin's criminal history are undisputed, a sentence within the advisory Sentencing Guidelines range pursuant to a career offender enhancement is "greater than necessary" to comply with the goals of sentencing set forth in 18 U.S.C. § 3553(a).

In the Presentence Investigation Report ("PSR"), the total offense level is 29 pursuant to a §4B1.1 enhancement.  With a criminal history category of VI, the resulting advisory Sentencing Guidelines range is 151 to 188 months, nearly double the Sentencing Guidelines range without the enhancement.[1]  In the case of a career offender enhancement, "[i]t is appropriate for a court considering the career offender guideline to analyze whether, under §3553(a)(1), the guideline produces a sentence 'reasonably related in severity to the level of sentence appropriate for the offense of current conviction.'  ABA Standards for Criminal

---

[1]Without the career offender enhancement, the total offense level is 21, and when combined with a criminal history category of VI, results in an advisory Sentencing Guidelines range of 77 to 96 months.

2

Justice-Sentencing § 18-3.5 at 59-60 (3d ed. 1994)." *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D.Wis.2005) (Adelman, J.). In this case, a sentence of 151 months, the low end of the career offender guideline range, and one that is twice the otherwise applicable range, is greater than necessary. Therefore, Mr. Cantin respectfully requests that the Court impose a sentence without application of the career offender guideline enhancement and in consideration of Mr. Cantin's mental health and substance abuse treatment needs.

## II.    Legal Standard

The Supreme Court and Congress require the district court to sentence in accordance with 18 U.S.C. § 3553(a). *Gall*, 128 S.Ct at 596-97; *see also United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007) ("Although the guidelines are treated as advisory after *Booker*, the application of section 3553(a) is mandatory."). The Supreme Court recently reiterated that "the guidelines are not mandatory, and thus the 'range of choice dictated by the facts of the case' is significantly broadened. . . . The Guidelines are only one of the factors to consider when imposing sentence." *Gall*, 128 S.Ct at 602. Thus, district judges are required "to filter the Guidelines' general advice through 3553(a)'s list of factors." *Rita*, 127 S.Ct. at 2469. In doing so, the judge "may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts

3

presented." *Gall*, 128 S.Ct at 596-97 (citations omitted).

Sentencing judges are required "to 'impose a sentence sufficient, but not greater than necessary, to comply with' the basic aims of sentencing in § 3553(a). *Rita*, 127 S.Ct. at 2463. The purposes of sentencing include the need:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
- to afford adequate deterrence to criminal conduct;
- to protect the public from further crimes of the defendant; and
- to provide the defendant with needed . . . medical care or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Section 3553(a)(1) also gives sentencing courts "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 128 S.Ct at 596 n.6. The Court must consider "those factors that are unique to an individual defendant . . . that are not taken into account when calculating the guideline range." *United States v. Schmitt*, 495 F.3d 860, 865 (7th Cir.2007).

In *Rita*, the Supreme Court forbade district courts from according a presumption of reasonableness to the Guidelines. 127 S.Ct. at 2465 ("The sentencing court does not enjoy the benefits of a legal presumption that the Guidelines should apply."). The Seventh Circuit has likewise held that a district court "may not employ a presumption that a sentence within the guidelines range is reasonable." *United States v. Lula*, 2008 U.S. App. LEXIS 511, at *3 (7th Cir. Jan.

4

9, 2008) (citation omitted); *see also United States v. Demaree*, 459 F.3d 791, 794 (7th Cir.2006); *United States v. Ross*, 501 F.3d 851, 853-54 (7th Cir.2007). District courts "must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence," *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir.2007). Moreover, the Supreme Court has held that appellate courts may not adopt a presumption of unreasonableness for sentences outside the advisory Guideline range. *Gall*, 128 S.Ct. at 595; *see also United States v. Omole*, 523 F.3d 691, 696 (7th Cir.2008) (citation omitted) ("[T]here is not a presumption of unreasonableness for sentences outside the Guidelines range."). The Seventh Circuit recently reversed a within-guideline sentence, holding that the district court had not considered how evidence of the defendant's mental illness affected the § 3553(a) factors. *Miranda*, 505 F.3d at 794.

District court judges therefore have broad discretion to sentence below the advisory guideline range. *See, e.g., United States v. Wachowiak*, 496 F.3d 744, 751 (7th Cir.2007) ("We will not substitute our judgment for that of the sentencing court. . . . As with other discretionary decisions, the district court is institutionally better situated to make individualized sentencing judgments than an appellate panel."); *United States v. Ngatia*, 477 F.3d 496, 501-02 (7th Cir. 2007) ("[T]he district court's choice of sentence, whether inside or outside the guideline range,

is discretionary and subject therefore to only light appellate review."); *Omole*, 523 F.3d at 698 ("[W]e defer to the sentencing judge, who considers each defendant as an individual and decides sentences on a case-by-case, rather than wholesale, basis."). A district court judge's "freedom to impose a reasonable sentence outside the range is unfettered," *Demaree*, 459 F.3d at 795, and a court may issue a below-Guideline sentence even in the absence of extraordinary circumstances, *Gall*, 128 S.Ct at 595. In fact, the Seventh Circuit will scrutinize a district court's refusal to grant a reduction below the range. *See, e.g., United States v. Vaughn*, 433 F.3d 917, 924 (7th Cir. 2006). A below-Guideline sentence is appropriate as long as the reasons are "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency." *Wachowiak*, 496 F.3d at 745.

After *Booker*, a district court should place "no limitation" on the information concerning the background, character, and conduct of a person convicted of an offense. 18 U.S.C. § 3661; *Booker*, 125 S.Ct. at 760 (quoting § 3661). In fact, "sentencing law not only allows, but *requires* judges to take individualized characteristics into account," *Omole*, 523 F.3d at 699 (citing *Gall*, 128 S.Ct. at 597), and a district court may give previously discouraged or forbidden sentencing factors "much more weight than the Guidelines themselves would have allowed,"

*United States v. Rose*, 453 F.3d 735, 737 (7th Cir.2006). As recently reiterated in *Gall*, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment that ensue." 128 S.Ct at 599 (citations omitted).

### III.    Benjamin Cantin's History and Characteristics and The Circumstances of This Offense

As stated above, Mr. Cantin is 31 years old and suffers from mental illness and alcoholism. Mr. Cantin grew up in Minnesota, and has one brother and two half-sisters. (PSR at 17). His parents divorced when Mr. Cantin was four years old, and Mr. Cantin had no contact with his father for approximately five years and minimal contact for the following six years. (Psychological Assessment 7/02/08).[2]

Mr. Cantin's history of mental health issues and substance abuse began as an early teen after several years of abuse at the hands of his stepfather, whom his mother married when Mr. Cantin was nine years old. From age nine until age fifteen, when the abuse was discovered by Mr. Cantin's teacher, his stepfather

---

[2] With the Court's permission, a copy of the evaluation will be filed with the court under seal.

used hockey pucks and baseball bats to beat him on a daily basis. (PSR at 17). He also regularly emotionally abused Mr. Cantin for not being as popular as his brother. Although his mother was aware of the abuse, she chose to "turn a blind eye" in order to maintain the financial security her husband brought to the family. (*Id.*). When child protective services finally became involved and Mr. Cantin's mother faced the possible removal of her children, she divorced his stepfather, but only after directing him to beat Mr. Cantin on their last night in his stepfather's home. (*Id.*). Three months later she kicked Mr. Cantin out of her home, calling him "Benedict Arnold." (*Id.* at 18, Psychological Assessment 7/02/08). Mr. Cantin's mother drove him to the center of the city where his father lived, at age fifteen, his mother left him there "to go find his father." (PSR at 18).

Although Mr. Cantin did not have any significant behavioral problems before he moved in with his father at age fifteen, his new neighborhood soon took a toll on his conduct. Mr. Cantin's father lived in a "bad neighborhood" and many of the peers Mr. Cantin met in his new neighborhood were involved in gang activity. (Psychological Assessment 7/02/08). As his father said, Mr. Cantin had always been an "outcast, left out," and "would do anything to get a friend and be accepted." (*Id.*). With his father working evenings and leaving him unsupervised, Mr. Cantin became involved in illegal activity. (*Id.*). Over the

8

following four years, Mr. Cantin was sent to various juvenile homes and facilities. (PSR at 18).

After Mr. Cantin's release from custody at age 18, he briefly resided with his mother and then later moved in with his father. His father's work frequently took him out-of-town for extended periods of time, and Mr. Cantin and his brother began to drink and have parties in their father's home, resulting in their eviction. (*Id.*). Thus, since the age of nineteen Mr. Cantin has passed through numerous periods of homelessness, and has been in and out of custody, with 28 months being his longest period of incarceration. (*Id.* at 8-14).

The development of Mr. Cantin's alcohol problems coincided with this period of homelessness and in the company of others who abused alcohol and other substances. Mr. Cantin began drinking at age nineteen, and by age twenty he was drinking every day. (*Id.* at 22). Apart from a few brief periods of sobriety, Mr. Cantin has been battling alcoholism ever since. Mr. Cantin's family has an extensive history of alcohol dependence, including two uncles who died at age 40 from alcoholism. (Psychological Assessment 7/02/08). Over time Mr. Cantin has needed increasing quantities of alcohol, and has experienced withdrawal symptoms including seizures. (*Id.*).

Mr. Cantin's history of mental illness has greatly contributed to his alcohol

dependence. When Mr. Cantin was fifteen and in juvenile custody, he was diagnosed with Bipolar Disorder. A year later, however, Mr. Cantin discontinued the use of medication after questioning the diagnosis based on its prevalence among adolescents in the juvenile justice system. (PSR at 21). Although Mr. Cantin had experienced anxiety throughout much of his life, he was the victim of a severe beating in January 2000, which left him hospitalized for three days and exacerbated his anxiety problems. (Psychological Assessment 7/02/08). In 2001, Mr. Cantin was diagnosed with an anxiety disorder and depression and was hospitalized for expressed suicidal ideation. (*Id.*). Since that time, Mr. Cantin has been psychiatrically hospitalized over fifty times due to panic attacks, of which there is also a family history. (*Id.*). Mr. Cantin was prescribed Paxil, which he successfully used for two years. However, with no health insurance, Mr. Cantin stopped using the medication in 2003 and turned to alcohol to self-medicate. (*Id.*).

Mr. Cantin recognizes and sincerely regrets the effect alcohol has had on his behavior, his relationships, and his ability to hold a job. Mr. Cantin met his wife, Christine, in 2000 and they married in 2001. They separated in 2004 because of Mr. Cantin's drinking problem, but he maintains contact with their six-year-old son, Jordan, to whom he frequently writes letters. (PSR at 19).

Mr. Cantin has participated in several detox programs in his struggle to overcome his dependency. In 2005 he completed an out-patient program and a relapse prevention program, but it was determined that Mr. Cantin, "had a greater need for individual therapy for possible mental health concerns versus his chemical use." (River Ridge Treatment Center Counselor's Discharge Summary 8/24/05). Shortly after completing the program, Mr. Cantin again began to self-medicate with alcohol and his drinking reached new levels. (Psychological Assessment 7/02/08). In August of 2007, Mr. Cantin successfully completed a 20-day in-patient program, but relapsed after taking the only job he could find as a cook in a restaurant that served alcohol. (*Id*.). A few months later, on February 20, 2008, Mr. Cantin again admitted himself to a detox program. However, he was terminated from the program after only a few days because he had no health insurance. (*Id*.). Mr. Cantin's family had told him that this was his last chance to get sober, or they would "cut [him] off." (Mission Care Detox Center Social History 2/21/08). Thus, prematurely discharged from the detox program and homeless in the Minnesota winter, Mr. Cantin boarded a bus to Chicago, consuming alcohol along the away and upon his arrival in Chicago. (Psychological Assessment 6/23/08 at 2).

In the early hours of the morning on February 25, 2008, two days after Mr.

11

Cantin's arrival in Chicago, an ambulance brought Mr. Cantin to the hospital for anxiety and alcohol-related problems. When he was medically cleared for release, Mr. Cantin asked to be admitted to an alcohol treatment program, but was put on a waiting list and turned away. (PSR at 24)

Shortly after his discharge from the hospital, Mr. Cantin went to a Walgreen's and purchased alcohol. Realizing he had no options in Chicago and feeling desperate, Mr. Cantin waited for someone to leave his or her car running outside of Walgreen's so he could take it and drive home to Minnesota. However, unable to take an unoccupied car and unwilling to take a car by force, Mr. Cantin abandoned that plan and headed to a Starbucks coffee shop, where he continued to consume alcohol. When he ran out of alcohol, Mr. Cantin went to the grocery store to purchase more, and on his way back to Starbucks, noticed a bank. Mr. Cantin entered the bank, inquired about opening a checking account, and left to return to Starbucks and to continue drinking. By this point, Mr. Cantin was so intoxicated that he shared his plan to rob the bank with other customers in Starbucks, and a customer later told the bank teller following the robbery that she had seen Mr. Cantin moments earlier in Starbucks where he had been "talking crazy." A few hours later, around 2 p.m., Mr. Cantin entered the bank, passed a note demanding $4,000, motioned to his waist, and made a reference to a ".38,"

although he was not carrying a gun. The teller gave Mr. Cantin $4700, and he ran back to the Starbucks, where he was almost immediately arrested. (*Id.* at 2).

Mr. Cantin is extremely remorseful for his actions and feels sorry for everyone involved, especially the bank teller. He thought that without an actual weapon, he would be given the money without frightening anyone, just like in the movies.

## IV. The Requested Sentence Comports with the Goals of Punishment Articulated in 18 U.S.C. § 3553(a).

A sentence that does not apply the career offender guideline enhancement and that considers Mr. Cantin's significant mental health and substance abuse treatment needs is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, 3553(a)(2)(A); to provide adequate deterrence, 3553(a)(2)(B); and to protect the public, 3553(a)(2)(C).

### A. Given Benjamin Cantin's history and characteristics, and the circumstances of this offense, the requested sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment under § 3553(a)(2)(A).

After *Booker*, courts must consider "those factors that are unique to an individual defendant . . . that are not taken into account when calculating the guideline range." *Schmitt*, 495 F.3d at 865. A lower sentence is appropriate if the

reasons for that sentence are, "specific to and generally correspond to leniency in sentencing." *Wachowiak*, 496 F.3d at 745. Given the circumstances of this case, a sentence within the advisory guideline range is not necessary to promote just punishment and promote respect for the law under § 3553(a)(2)(A). The PSR notes that Mr. Cantin's history of mental illness may warrant a departure from the Sentencing Guidelines pursuant to USSG §5K2.13. The Seventh Circuit has held that "a person who would not have committed a crime but for his mental illness would be less deserving of punishment because he is 'not as evil . . . as one who would not be law abiding even if he were not mentally impaired.'" *Miranda*, 505 F.3d at 793-94 (quoting *United States v. Dyer,* 216 F.3d 568, 571 (7th Cir. 2000)). Given Mr. Cantin's extensive history of mental illness, he is "less deserving of punishment" than someone who commits this crime and is not mentally impaired. In addition, the career offender enhancement nearly doubles the advisory guideline for Mr. Cantin's offense. Thus, the requested sentence will still reflect the seriousness of the offense.

> **B.** **The requested sentence will protect the public under § 3553(a)(2)(c) as the advisory guideline range overstates Mr. Cantin's risk of recidivism.**

It is undisputed that Mr. Cantin has a criminal history that makes him eligible for a career offender enhancement. However, given Mr. Cantin's history

and characteristics and the circumstances of the offense, the advisory guideline range that results from such an enhancement is "greater than necessary" to protect the public. Instead, the requested sentence and continued mental health and substance abuse treatment will sufficiently deter Mr. Cantin from committing crimes in the future.

Mr. Cantin was evaluated on May 10, 2008, by psychologist, Dr. Michael Igaravidez. Dr. Igaravidez determined that while Mr. Cantin does suffer from major mental illnesses, Mr. Cantin's history of significant conduct disturbances does not meet the criteria for Anti-Social Personality. He notes, "[t]his is an important distinction to make, as Anti-Social Personality Disorder has a chronic course and individuals with the disorder often lack empathy for others, are emotionally callous and look at others' suffering with contempt. They have an inflated and arrogant perception of themselves, and come across as cocky and overly self assured. . . . [T]hese are not characteristics that describe Mr. Cantin, outside of periods of excessive use of alcohol, and it would be inaccurate and irresponsible to label Mr. Cantin with this diagnosis." (Psychological Assessment 7/02/08).[3]

---

[3] Dr. Igaravidez also had problems with the evaluation conducted by Dr. Greg Hanson found in the PSR. He found inconsistency with Dr. Hanson's finding of "no major mental illness," and his later report that he suffers panic attacks, which is a major mental illness. (*Id.*).

Dr. Igaravidez, as well as Mr. Cantin's family, noted that his problematic behavior has occurred while Mr. Cantin was intoxicated, or is otherwise related to his alcohol dependency, which stems from self-medication of his mental illnesses. Mr. Cantin's father describes him as "very docile and funny," and blames his current situation on his "genes and environment." (*Id.*). Mr. Cantin's brother said that his brother had not been in any fights while sober, and said that when he is not drinking he is "sociable and funny." (*Id.*). Mr. Cantin's mother said that when he is not using alcohol he is the "nicest guy, wouldn't hurt a fly." (*Id.*). Mr. Cantin's wife says he is a "completely different person" when he drinks and that "every pain from his entire life comes out when drunk." (*Id.*). As described above, these "pains" are numerous and deep, beginning, through no fault of his own, when Mr. Cantin was only nine years old and continuing to this day as he battles serious mental illnesses.

Dr. Igaravidez has identified various bio-psycho-social factors that strongly contributed to Mr. Cantin's history of criminal activity, including the current offense. He believes these factors can be treated to decrease the risk Mr. Cantin poses to engage in future violent, or otherwise criminal activity. (*Id.*). His evaluation indicates that Mr. Cantin is not prone to problematic aggressive attitudes, or verbal or physical aggression. Rather, his mental illnesses have led to

16

mood instability, impulsivity, and confusion, including difficulty, at times, thinking clearly, concentrating and making decisions.   Dr. Igaravidez believes that given  Mr. Cantin's willingness to participate in any treatment services offered, his risk of violence can be reduced through successful treatment and management of his alcohol dependence.  Significantly, Dr. Igaravidez notes that only a small proportion of people with alcohol dependence are untreatable.  In addition, Dr. Igaravidez's evaluation concludes that Mr. Cantin's successful participation and completion of treatment, including compliance with prescribed psychotropic medication, with which Mr. Cantin has been unable to comply in the past due to lack of health insurance, can serve to stabilize his moods and behavior, including improved decision making, better judgment and increased impulse control.  (*Id.*).

Moreover, Mr. Cantin has obtained his GED and attended some college, which lowers his risk of recidivism.  (PSR at 24, United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 29 (Exh. 10) (May 2004), *available at* http://www.ussc.gov/publicat/Recidivism_General.pdf).  In addition, Mr. Cantin has maintained gainful employment during periods of sobriety. Accordingly, the requested sentence combined with mental health and substance

abuse treatment is sufficient to prevent him from committing future crimes.[4]

### C. It is not necessary to sentence Mr. Cantin within the advisory guideline range to deter others under § 3553(a)(2)(B).

Section 3553(a)(2)(B) requires the Court to impose a sentence that "adequate[ly]" deters others from committing similar crimes.  The Seventh Circuit has stated that "mental illness . . . might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant general deterrent effect on persons in the defendant's class."  *Miranda*, 505 F.3d at 793.  Thus, with Mr. Cantin's history of mental health issues and substance abuse, a sentence within the advisory Sentencing Guidelines with the career offender enhancement will not further the 3553(a)(2)(B) goal of general deterrence any better than the sentence Mr. Cantin requests.

## V. Conclusion

Mr. Cantin respectfully requests that the Court sentence him without application of the career offender guideline enhancement and in consideration of his significant mental health and substance abuse treatment needs.  Such a sentence does not create an unwarranted disparity under 3553(a)(6), because the

---

[4] *See Rita*, 127 S.Ct. at 2473 (Stevens, J., concurring) (stating that although characteristics such as age and education "are not ordinarily considered" under the guidelines, "[t]hese are, however, matters that 3553(a) authorizes the sentencing judge to consider.").

particular facts of the case justify a variance from the guideline range, *see United States v. Wachowiak*, 412 F. Supp. 958, 966 (E.D. Wis. 2006), and is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,
THE FEDERAL DEFENDER PROGRAM, INC.
Terence F. Mac Carthy
Executive Director
By:


Mary H. Judge
*Attorney for Benjamin Cantin*

55 East Monroe St.
Suite 2800
Chicago, IL 60603
(312) 621-8300

## CERTIFICATE OF SERVICE

The undersigned, <u>Mary H. Judge</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>July 16, 2008</u>, to counsel/parties that are non-ECF filers.

Rebecca Fowlie
United States Probation Office
55 E. Monroe Street, 15th Floor
Chicago, IL 60603


By:    <u>s/Mary H. Judge</u>
MARY H. JUDGE
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8336